## Case No. 15,359.

### UNITED STATES v. HEWES.

[Crabbe. 307; 2 Law Rep. 329; 1 Liv. Law Mag. 545; 4 Pa. Law J. Rep. 358; 2 Am. Law J. (N. S.) 204.] 1

District Court, E. D. Pennsylvania. Jan. 31, 1840.

CONSTRUCTION OF STATUTES—SOVEREIGN POWER—IMPRISONMENT FOR DEBT.

1. The sovereign power is not bound by general words in a statute. but only when included expressly. or by necessary implication.
[Cited in Dollar Sav. Bank v. U. S.. 19 Wall. (86 U. S.) 239.]
[Cited in Hoge v. Brookover, 28 W. Va. 310.]

2. The United States and their debtors are not included in the provisions of the act of February 28, 1839 (5 Story's Laws, 2760 [5 Stat. 321]).
[Cited in Hanson v. Fowle. Case No. 6,041. Distinguished in U. S. v. Tetlow, Id. 16,-456; Re Sanborn, 52 Fed. 585.]

The defendant in this case [Samuel F. Hewes] was in execution on a judgment rendered for the plaintiffs, on a debt due before the 5th July, 1838; he was discharged, by the court of common pleas of Philadelphia county, as an insolvent, under the insolvent law of the state of Pennsylvania, on the 5th of July, 1838; and petitioned this court that he might be liberated from imprisonment, under the provisions of the act of February 28, 1839.

Mr. Grinnell, for defendant.

The United States are bound by the discharge given by the court of common pleas, all the requirements of the law have been complied with, and the petitioner is exonerated from all liability. Act Assem. Pa., "relating to insolvent debtors," of June 16, 1836 (P. L. 729; Dunl. Laws Pa. 717, §§ 10, 11; Dunl. Laws Pa. 719); Com. v. Cornman, 4 Serg. & R. 2; Act Cong. Feb. 28, 1839 (5 Story's Laws, 2760 [5 Stat. 321]). The words of the act of 1839 are general, and without restriction or exception. The former acts had express exception of debts due the United States. Act Jan. 17, 1800 (1 Story's Laws, 715 [2 Stat. 4]); Act March 3, 1817 (3 Story's Laws, 1652 [3 Stat. 399]); Act March 2, 1831 (4 Story's Laws. 2236 [4 Stat. 467]). And see People v. Rossiter, 4 Cow. 143; U. S. v. Wilson, 8 Wheat. [21 U. S.] 253; U. S. v. Hoar [Case No. 15,373]; U. S. v. Fisher, 2 Cranch [6 U. S.] 358, 389.

Mr. Read, U. S. Dist. Atty.

This very question has arisen in the Southern district of New York. U. S. v. Wood [Case No. 16,755a]. The United States are excepted from all general statutes, unless either expressly named therein, or included by necessary implication. Dwar. St. 668; Chit. Prerog. 382; 1 Kent, Comm. (3d Ed.) 460, 461; U. S. v. Hoar [supra]; U. S. v. Greene [Case No. 15,258]; Com. v. Baldwin, 1 Watts, 54. The state insolvent laws require notice to be given to the creditors; but when the government are creditors, who is to be notified? The president? the secretary of the treasury? the district attorney? the comptroller? the marshal? None have authority to receive such notice. If the plaintiffs are included in the act of 1839, they must come under all the restrictions of the state law, and be treated as common creditors, having no priority or preference; and they must have an attorney in every county court in the Union, in order to guard their interests. The provisions of the act of March 3. 1797 (1 Story's Laws, 464 [1 Stat. 512]), will be wholly nugatory if the act of 1839 has the extent contended for.

Mr. Grinnell, in conclusion.

The decision of the point has been made in New York. It has been argued that, if the United States are bound by the Act of 1839, they will lose their priority; there is nothing in the Pennsylvania Act of 1836, or in the decisions under it, to sanction this argument. The United States would still be preferred creditors.

---

1 [Reported by William H. Crabbe, Esq. 2 Law Rep. 329. and 1 Liv. Law Mag. 545, contain only partial reports.]

HOPKINSON, District Judge. A suit was brought by the United States, against the defendant, to the last November sessions, and a judgment rendered against him. Upon this judgment a writ of capias ad satisfaciendum was issued, the defendant arrested, and committed to prison. He has presented his petition, praying to be discharged from imprisonment, by virtue of an act of congress, passed on the 28th day of February, 1839, entitled "An act to abolish imprisonment for debt in certain cases," by which it is enacted, "that no person shall be imprisoned for debt in any state on process issuing out of a court of the United States, where, by the laws of such state, imprisonment for debt has been abolished; and where, by the laws of a state, imprisonment for debt shall be allowed, under certain conditions and restrictions, the same conditions and restrictions shall be applicable to the process issuing out of the court of the United States; and the same proceedings shall be had therein, as are adopted in the courts of such state."

When this act shall be brought into practical operation, some difficulties will occur, which will probably require a more explicit declaration of the intention of the legislature; at present we have to do with but one. The defendant has exhibited a certificate, from the court of common pleas for the city and county of Philadelphia, stating that he had presented his petition to that court for relief, as an insolvent debtor; that he had given notice to his creditors to appear and show cause, if any they had, why he should not receive the benefit of the provisions of the acts of assembly, for the relief of insolvent debtors: no cause being shown why the prayer of the petitioner should not be granted, he took the oath prescribed by law, made an assignment of all his estate, and was discharged; "and it was thereupon ordered, by the said court, that the said petitioner shall not, at any time thereafter, be liable to imprisonment, by reason of any judgment or decree, obtained for the payment of money only, or for any debt, damages, costs, sum, or sums of money, contracted, accrued, occasioned, owing, or becoming due, before the time of such assignment." The single question in this case is, whether a debtor of the United States, imprisoned by process issuing from a court of the United States, or on a judgment rendered against him by that court, can avail himself of the above discharge, to be liberated from imprisonment under the said judgment and process. In other words, are the United States, and their rights and remedies against their debtors, affected by, and included in, the provisions of the act of congress of February, 1839? This is a question of grave importance to the government of the United States, as it may affect their securities for the public revenue, and their remedies against their various and numerous agents, who are receivers of the public money. It therefore demands a very careful examination, and we should not declare, judicially, the intention of the legislature, until we are well satisfied of it.

The petitioner rests his right to a discharge on the broad and general terms of the act of congress, from which no exception is made of a debt due to the United States, but it enacts that no person shall be imprisoned for debt in any state, on process issuing out of a court of the United States, &c. The words it is said embrace a debtor of the United States, and a debt due to them. If they are to be taken in their large and literal meaning, it is certainly so. But it is contended on the part of the United States (1) that, inasmuch as the United States are not expressly named and included in the act of congress, they are, by implication of law, excluded, and that their rights, interests, and remedies, cannot be affected by general words, unless a clear intention is apparent to include them; (2) that, in this case, the intention of congress that the United States should not be included in the provisions of this statute, may be collected from all the acts of congress, in relation to their debtors, and the whole policy of the government on that subject. The first is purely a question of law, to be decided by the adjudications of courts of law, for, if it be the settled law, it must be presumed that congress knew it to be so, and had it on their minds in passing the act in question. It will then be my duty only to inquire what is the law, how has it been pronounced by competent tribunals, and to abide by what they have decided. Fortunately the question has more than once come under the consideration and judgment of our own courts, as well as of those of England. I will first refer to the English authorities.

In a late elementary work, Dwarris on the Construction of Statutes, which seems to have been compiled at least with the ordinary care of such works, it is said, "It is a rule that the king shall not be restrained of a liberty or right he had before, by the general words of an act of parliament, if the king is not named in the act." Page 668. In Rex v. Allen, 15 East, 333, the question arose on the statute of 48 Geo. III. c. 74, § 15, which gave to the sessions an appeal from a conviction by justices of the peace, and empowered the sessions to hear and finally determine the facts and merits of the case in question between the parties, and enacted that no certiorari should be allowed to set aside the decision of the sessions. It was held that this did not preclude the crown from removing the conviction, and the order of the sessions quashing the same by certiorari. This is a very strong case. No words can be more direct and clear to take away the right of removal by certiorari, from the determination of the sessions, not only by declaring that it shall be final, but by the further express declaration, that no certiorari

should be allowed; and it is the stronger as it gives a right of removal to one party which is denied to the other. In giving his opinion of this case, Grose, Justice, says: "The question was whether the act intended to take from the crown the power of removing the conviction by certiorari, for it is clear that, unless the act has plainly said so, the power of the crown is not restrained. There are no words expressly taking it away. Then was it the clear intention of the legislature so to do? For I admit that, if there was such a clear intention, the crown would be restrained. This, it is to be observed, is an excise law, passed for the better collection of the revenue, which is open to a different consideration in this respect from ordinary cases." The judge argues that if in a case affecting the revenue. it was the intention of the legislature to take the power from the crown, it would have been done by express words. Le Blanc and Bailey. Justices. concur in this opinion. A similar decision was given in Rex v. Inhabitants of County of Cumberland, 6 Term R. 194, in which the construction of the statute of Anne. c. 18, § 5, on an indictment for not repairing a bridge, was in question. There are other cases decided on the same principle; indeed it has not, as far as I know, been questioned in the courts of England. 1 Bl. Comm. 261. The king is not bound by any act of parliament, unless he be named therein by special and particular words. The most general words that can be devised (any person or persons, bodies politic or corporate, &c.), affect not him in the least. if they tend to restrain or diminish any of his rights or interests. It would be of mischievous consequence to the public. This may be called "prerogative,"—the prerogative of the crown or king. In England it is attached to the king, because he is the sovereign of the country; but it is so attached to the king as the sovereign power, wherever it may reside. and in that sense we may speak of prerogative without any repugnance to the principles of our constitution, or the spirit of our institutions. It is nothing more than giving certain necessary rights or privileges to the whole community. which are denied to individual citizens on principles of public policy and expediency or the "general welfare." Many preferences of this sort, granted to the government. are found in our statutes, and no one has thought of repudiating or branding them with any odium as "prerogatives."

Without a further reference to English authority on this subject, I shall inquire how far the same principle of exemption of the government from the general words of a statute. has been adopted or recognised by American judges. I will begin with an elementary work. but whose author has held the highest judicial stations. and whose learning and accuracy of research are held in the best estimation by every judge and lawyer of our country. In the first volume of Kent's Commentaries on American Law (3d Ed.) 460, it is said, "It is likewise a general rule, in the interpretation of statutes limiting rights and interests, not to construe them to embrace the sovereign power or government, unless the same be expressly named therein, or intimated by necessary implication." This is precisely the English rule, and no suggestion is made of a different rule here; on the contrary. the learned commentator, in addition to his English authorities. cites the opinion of Judge Story, as delivered in U. S. v. Greene [Case No. 15,258], which is fully to the point. The case there decided was that the United States may sue in the district court as endorsees of a promissory note. against the maker thereof, although the maker and payee are citizens of the same state, notwithstanding the restriction in the eleventh section of the judiciary act, which the judge says was not intended to apply to suits brought by the United States, or if so intended, was repealed by the act of 1815. c. 253. [3 Stat. 244.] Now the words of the judiciary act of 1789 [1 Stat. 73]. are as general and comprehensive as possible. "No civil suit shall be brought," &c.. "nor shall any district or circuit court have cognizance of any suit to recover the contents of a promissory note, or other chose in action, in favor of an assignee, unless a suit might have been prosecuted in such court to recover the said contents, if no assignment had been made." There is no exception of the United States, or of a suit brought by them, as assignees; yet they are not restrained by the general words of the act, which exclude every other suitor from these courts. And why did not these general words include the United States? The reason is given in the opinion of the court. The learned judge who delivered the opinion admitted that if the terms of the law are to be understood without any limitation. they clearly extend to the case before him. After stating some reasons why it should not be presumed that the act was intended to place this restriction on the United States. he says. "The fair construction of the terms. under such circumstances. is to restrain their generality; to look at the primary and leading intention of the provisions. and to restrain the words to obvious cases. Effect may thus be given to the whole language, without breaking in upon a very important national policy." What did the judge consider as the "obvious cases" intended to be provided for by that act? Cases between individual citizens. and not where the United States was a party. Does not the same reason and observation apply to our case?

What was the national policy which he thought so important. and not to be broken in upon? To give the United States the use of their own courts. and not to subject their rights and interests to state tribunals. And is not this policy found in the case before us? Did congress intend to submit the whole system and policy of the United States for the

collection and preservation of their revenue, for holding the responsibility of their agents, officers, and debtors in their own hands, to the various and ever-changing provisions and immunities of the insolvent laws of twenty-six states? That the rights and remedies of the United States should be one thing in Pennsylvania, another in New York, another in Maryland, and so on through the whole? Is there anything like a system, like uniformity, or- equal justice, in such a state of things? Should we suppose, without a clear and express enactment, that congress intended to introduce such confusion and uncertainty in the powers of the government over its officers and revenue? In the case cited, the judge puts the opinion of the court on the safe and rational ground, that we are not bound to follow to the whole extent the meaning of the terms used in an act of congress; that we may restrain their generality by the circumstances of a particular case, and look to the primary and leading intention of the provisions, and give it such effect as will not break in upon an important national policy. In another part of this opinion the judge expressly recognises the rule I have stated for the construction of statutes. He says, "It is a general rule in the interpretation of legislative acts, not to construe them to embrace the sovereign power or government, unless expressly named, or included by necessary implication." He cites for this rule, with many other authorities, a case reported in 4 Mass. 522, 528,—Stoughton v. Baker. It will be observed that Chancellor Kent, in his Commentaries, adopted the language of Judge Story. We have another case decided by the same court. U. S. v. Hoar [Case No. 15,373], in which it was determined that neither the general statute of limitations, nor that of Massachusetts as to executors and administrators, binds the United States in a suit in the circuit court. Judge Story, delivering the opinion of the court, says, "It may be laid down as a safe proposition, that no statute of limitations has been held to apply to actions brought by the crown, unless there has been an express provision including it. For it is said, that, where a statute is general, and thereby any prerogative, right, title, or interest is divested or taken from the king, in such case the king shall not be bound unless the statute is made by express words to extend to him." After giving the reason of the rule which excepts the crown from the operation of statutes of limitation, which, he says, will be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers, he adds, "and though this is sometimes called a prerogative right, it is in fact nothing more than a reservation or exception, introduced for the public benefit, and equally applicable to all governments." He also refers to the case reported in 4 Mass. 528,—Stoughton v. Baker.

These have been the doctrines adopted and unreversed by a circuit court of the United States. The supreme court of New York has also recognised them. In People v. Rossiter, 4 Cow. 143, we have not to deal with the king and his prerogatives. The decision, as given in the syllabus of the case, is that "a discharge under the act to abolish imprisonment for debt, does not extend to a debt due to the people of this state. Nor, semble, does any insolvent or bankrupt law, unless the people are named in it." The report is very short, and the decision of the question seems not to have been attended with any doubt or difficulty. Judgment was obtained against an attorney of the court, for clerk's fees due to the plaintiff, upon which he was imprisoned under a ca. sa. after he had obtained his discharge under the act to abolish imprisonment for debt in certain cases. This is precisely the title of the act of congress in question. The counsel of the prisoner moved for his discharge, on the broad and unqualified words of the act, that "the debtor shall be exempt from imprisonment, for or by reason of any debt or debts due at the time of making the assignment." There was no exception, he said, of debts due to the people, and none should be implied. The attorney general replied, that general words did not bind the people,—they are not named; and that the rule is the same as to them, which prevails in England as to the king. By the court: "The motion must be denied. The people are not bound by an act of this kind unless they are named in it. The rule is the same as in England. The king is not bound by a bankrupt law, unless named; and the people are the king for the purposes of this rule." Will it not be singular if the United States shall be bound by an insolvent law of New York, when the state herself is not so; both depending on general words in a statute? Can she claim the benefit of a rule of construction against her debtors which is denied to the United States? The reports of the supreme court of Pennsylvania furnish a decision asserting the same principles. In Com. v. Baldwin, 1 Watts. 54, it was decided, after a careful examination, by the court, of cases in the courts of the United States, that the state is exempt from the operation of the acts for the revival of judgments, to continue the lien on real estate. There is in those acts no exception in favor of the commonwealth, and the terms are broad enough to include all and any judgments. That the United States have not heretofore been affected or barred by a discharge of their debtor under a state insolvent law, was settled by the supreme court in the case of U. S. v. Wilson, 8 Wheat. [21 U. S.] 253; and so the law now remains, unless it has been changed by the act of congress of February, 1839, now under consideration.

The principles maintained in the cases I have referred to, have not been contradicted or impeached, by any authority cited at the bar, nor by any I have found in my investi-

gation. I shall leave them to rest on the opinions of learned courts and judges in our own country, as well as in England, and supported, also, as I think, by their own strength and good reason. Putting aside the rule of construction, which excepts the sovereign power from the operation of such laws, unless. expressly named, as a rule binding in courts of law, the same result may be reached by the ordinary doctrine, which refers to the intention of the legislature for the interpretation of their acts. The learned judge, to whose opinions and reasoning I always refer with confidence, says (U. S. v. Hoar [supra]): "Independently of any doctrine founded on the notion of prerogative, the same construction of statutes of this sort ought to prevail, founded upon legislative intention. Where the government is not expressly, or by necessary implication. included, it ought to be clear, from the nature of the mischiefs to be redressed, or the language used. that the government itself was in contemplation of the legislature, before a court of law would be authorized to put such a construction upon any statute. In general, acts of the legislature are meant to regulate and direct the acts and rights of citizens; and in most cases the reasoning applicable to them applies with very different, and often contrary, force, to the government itself. It appears to me, therefore, to be a safe rule, founded on the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act."

There is another principle or rule in the construction of statutes, so well established by authority, and so entirely reasonable in itself, that it may be assumed to be unquestionable. It is this, that not only one part of a statute may be properly called in, to help the construction of another part, but that it will be inferred or presumed. that a number of statutes, relating to the same subject. were intended to be governed by one spirit and policy; to be consistent and harmonious in their several parts and provisions. Dwar. St. 699. The same author adds as the consequence of this intendment. that "it is an established rule of law that all acts, in pari materia, are to be taken together, as if they were one law, and they are directed to be compared, in the construction of statutes, because they are considered as framed upon one system, and having one object in view." This doctrine is affirmed by Duck v. Addington, 4 Term R. 447–450; Ex parte Drydon, 5 Term R. 417; Ailesbury v. Pattison, Doug. 30. In this last case Lord Mansfield says: "All acts in pari materia are to be taken together, as if they were one act." In Timmins v. Rowlinson. Burrows, 1607, he says. "they are to be considered as one system."

What have been the spirit and policy, the

system adopted by the government of the United States, in relation to its debtors, running through all the acts of congress on that subject?

1. That the rights, interests, and remedies of the United States, shall not be impaired, or affected, by the insolvent laws of any state; that they have never allowed the courts of any state to interfere between them and their debtors, or to prescribe any terms, conditions, or restrictions, upon their rights and remedies, for recovering or securing their debts.

2. That they have never allowed even their own courts, constituted by their own authority, to discharge one of their debtors from imprisonment under a judgment and execution, at their suit. The general bankrupt act, and the law of congress for the relief of insolvent debtors, gave no such power to the commissioners in the one case, and the courts in the other.

3. That for all such questions, for all such indulgences, a tribunal was created, which was the government itself; and this power and discretion was lodged with the president, in certain cases, and with the secretary of the treasury, in certain other cases. To these high and responsible officers the whole subject was committed; the examination of the circumstances of each case was imposed upon them, and the decision upon it vested in them, upon such terms and conditions as they should think proper to exact. 1 Story's Laws, 750, § 62 [2 Stat. 36], the bankrupt act; 1 Story's Laws, 715 [2 Stat. 4], act for the relief of persons imprisoned for debt; 3 Story's Laws, 1652 ([3 Stat. 399] Act March, 1817), application to be made to the president; 1 Story's Laws, 506 ([1 Stat. 562] Act June 6, 1798), application to be made to the secretary of the treasury; 4 Story's Laws, 2236 [4 Stat. 467], appointing commissioners to report to the secretary; 3 Story's Laws, 1997, § 38 [4 Stat. 113]. of the postoffice act. It is true that in the bankrupt and insolvent acts there is an express exception of the United States. but we cannot presume from this that congress intended to reverse or abandon the rule of construction which would have excepted them. It was the exercise of that abundant caution, often found in statutes.

Can we believe it was the intention of congress, by the act of 1839, to abandon all this system, to change all this financial policy; to repeal the distinction heretofore made between ordinary debtors of the United States and "persons indebted as the principal in an official bond, or for public money received by him. and not paid over or accounted for, or for any fine. forfeiture, or penalty incurred by the violation of any law of the United States?" Did congress intend to give to the state courts a power over the rights and interests. over the revenue of the government, which had been denied. and is yet denied, to its own courts, which

had been carefully kept in its own hands? Are collectors of the customs, and debtors on duty bonds and their sureties, postmasters and other receivers of public moneys, to be thus discharged from the liability of their persons for such debts? Are persons imprisoned for fines, penalties, and forfeitures, to be liberated by the order of a state court, acting under a state insolvent law? Are such cases to be submitted to the judgment and discretion of every county court in six-and-twenty states, with, practically, no opportunity afforded to the United States to attend to their interests; to detect fraud, or concealed property; to oppose the discharge in any way or for any reason? It is no extravagant case to suppose that an absconding defaulter for immense sums might return with full pockets, apply to some obscure county court, in a distant state, and pass himself through the forms— for they are little more—of an insolvent law, and be afterwards secure in the enjoyment of his concealed plunder, which the searching power of the United States might have forced from him. Are these extensive and vital changes in the system and policy of the United States to be effected by general words, having no express reference to them, or to the United States? Assuredly such consequences would not have been left to a question of construction. The intention would have been declared in express and unequivocal language. What will become of the right, always claimed, of a priority or preference of payment from an insolvent estate? There is no provision for this in the insolvent laws of Pennsylvania, nor do I presume it will be found in any insolvent act. But the law of 1839 declares, that "where, by the laws of a state, imprisonment for debt shall be allowed, under certain conditions and restrictions, the same conditions and restrictions shall be applicable to the process issuing out of the courts of the United States." What the effect of these provisions will be upon the priority of the United States, I am not now called upon to say, but it would seem that, if the same conditions are to be imposed, no other or additional ones could be required of the debtor. All these difficulties, and many more, will be avoided, by adopting, in the construction of this statute, the reasoning of Judge Story already referred to, "that, in general, acts of the legislature are meant to regulate and direct the acts and rights of citizens, and in most cases the reasoning applicable to them applies with very different, and often contrary, force, to the government," and that "the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act."

Other difficulties and inconveniences will arise by extending the provisions of this act to the United States. The provisions of the insolvent laws of the different states, the conditions and restrictions they impose upon the debtor, are various and entirely different from each other. The United States then, as well as their debtors, will have no uniform rule of responsibility. There will be no harmony in the relations between the government and its debtor. The rights and remedies will be one thing in one state, another thing in another, and so throughout the whole twenty-six states. Could such confusion have been intended; such an entire destruction of everything that can be called a system,—of all pretence to one policy? Again, the act of Pennsylvania, and, I presume, every other insolvent act, requires a notice of some kind, either personal or by public advertisement, to be given to the creditors of the petitioner. To whom is this notice to be given for the United States? Who is bound or authorized to receive it for them? Is it the president, or the secretary of the treasury, who have heretofore had the superintendence of the debtors and debts of the United States; or the district attorney? I have seen no authority given to either of them to accept any such notice, or to bind the United States by appearing in pursuance of it. There are other details in the insolvent law of Pennsylvania which it will be difficult to apply to the United States. In the argument of this case the district attorney referred to the act of congress of March, 1797, by which it is enacted, that all writs of execution, upon any judgment obtained for the use of the United States, in any court of the United States, may run and shall be executed in any other state, but shall be issued from and made returnable to the court where the judgment was obtained. Must the discharge of which the debtor may avail himself against this execution, be under the insolvent law of the state in which he is arrested, or of the state in which the judgment was obtained; or will a discharge by the court of any state be sufficient for his liberation? The words of the act would seem to refer only to the laws of the state from which the process issued, but it is by no means clear what construction might be put upon it under the notion of extending it in favor of liberty.

I have given this case a careful examination, and extended the explanation of my views of it beyond what may be thought necessary, because I am so unfortunate as to differ in my construction of this act of congress, from the learned and estimable judge of the Southern district of New York. It would have been very gratifying to me, if I could have come to the same result he has, upon this question. It must, however, be remembered that the point was not argued or made a question by the district attorney, in the case decided in New York. The attention of the court was drawn to another part of the case, and the application

of the act to the debtors of the United States, although mooted, was not argued, as the district attorney had no doubt that the provisions of the act did include the United States. Certainly the opinion of this learned lawyer and respectable gentleman ought to make and does make me more diffident of my own; I am bound, however, to declare my opinion according to my own conviction of the true construction of the act of congress in question, and that is, that it does not include in its provisions the United States, or the debtors who may be imprisoned on a judgment obtained at their suit, in a court of the United States. The prayer of the petitioner is denied.